Dear Representative Walton:
You have requested an opinion on the following question:
 Please provide me with an opinion as to whether or not there is a conflict of interest or a prohibition against a Member of the Missouri General Assembly providing legal services as a private attorney to the Bi-State Development Agency — an agency established by interstate compact between Missouri and Illinois, as authorized by federal law.
* * *
 Bi-State is partially self-insured and employs an insurance agency to administer its liability program. Whenever a claim is filed against Bi-State, a private attorney is employed to defend said claim. Furthermore, Bi-State employs private attorneys to render other legal services.
Article III, Section 12 of the Missouri Constitution provides:
 No person holding any lucrative office or employment under the United States, this state or any municipality thereof shall hold the office of senator or representative. When any senator or representative accepts any office or employment under the United States, this state or any municipality thereof, his office shall thereby be vacated and he shall thereafter perform no duty and receive no salary as senator or representative. During the term for which he was elected no senator or representative shall accept any appointive office or employment under this state which is created or the emoluments of which are increased during such term. This section shall not apply to members of the organized militia, of the reserve corps and of school boards, and notaries public.
Is Bi-State Development Agency (hereinafter "Bi-State") a "municipality" as that term is used in Article III, Section 12, Missouri Constitution, and does the representation of the agency's legal interest by an attorney qualify as "employment under . . . any municipality"?
The Bi-State Metropolitan Development District was established in 1949 by an interstate compact entered into by the states of Missouri and Illinois with the approval of Congress. The district embraces the City of St. Louis and the counties of St. Louis, St. Charles and Jefferson in Missouri, and the counties of Madison, St. Clair and Monroe in Illinois. The object of the compact was to provide for the future planning and development of the district "holding in high trust for the benefit of its people and of the nation the special blessings and natural advantages thereof". Section 70.370, RSMo 1978.
The compact also created "The Bi-State Development Agency of the Missouri-Illinois Metropolitan District" as "a body corporate and politic" to make plans for the development of the district and with power to plan, construct, maintain, own and operate bridges, tunnels, airports and terminal facilities, among other powers. Section 70.370, RSMo 1978. By subsequent legislation enacted by the two states, the powers of Bi-State were expanded. Section 70.373, RSMo Supp. 1984. The original compact gave Bi-State power to charge and collect fees for the use of facilities owned and operated by it. Section 70.370, RSMo 1978. Missouri also enacted the Transportation Sales Tax Act of 1973, Sections 94.600, et seq., RSMo, allowing for the establishment of local sales taxes to provide revenue for Bi-State.
The meaning of the term "municipality" depends on the context in which it is used. Beiser v. Parkway SchoolDistrict, 589 S.W.2d 277, 280 (Mo. banc 1979). For instance, when interpreting the term "municipality" in Section 71.185, RSMo 1978, in which sovereign immunity is waived for municipalities, the term "municipality" is construed narrowly because exceptions to sovereign immunity are always construed narrowly.State ex rel. St. Louis Housing Authority v. Gaertner,695 S.W.2d 460, 462-463 (Mo. banc 1985); Beiser v. Parkway SchoolDistrict, supra. See also State ex rel. Milham v.Rickhoff, 633 S.W.2d 733 (Mo. banc 1982), which provided a narrow interpretation for the term "municipal corporation" as used in the venue statute for municipal corporations and as applied to the statewide operations of the University of Missouri.
When the context requires the broader meaning for the words "municipal corporation", however, the court does not hesitate to apply it. For instance, the broad meaning of "municipal corporation" was applied in deciding that a drainage district and the St. Louis Housing Authority were "municipal corporations" for purposes of being exempt from taxes under Article X, Section 6, Missouri Constitution 1875, because of the presumption that the state does not intend to tax its political subdivisions. Stateex rel. Caldwell v. Little River Drainage District, 291 Mo. 72,236 S.W. 15 (1921) and Laret Investment Company v. Dickmann,345 Mo. 449, 134 S.W.2d 65 (banc 1939), and subsequent explanation of these holdings in Beiser v. Parkway School District,supra. Similarly, that broader meaning was adopted for the term "municipality" in Article VI, Section 16, Missouri Constitution, in regard to whether the St. Louis Housing Authority could enter into the cooperative contracts authorized by that provision. St. Louis Housing Authority v. City of St.Louis, 239 S.W.2d 289 (Mo. banc 1951).
When interpreting the constitution, the rules "employed in construction of constitutional provisions are the same as those employed in construction of statutes, but the former are to be given a broader construction due to their more permanent character. . . . This court has recognized that in construction of constitutional provisions, it should undertake to ascribe to words the meaning which the people understood them to have when they adopted the provision. . . . Of course, this Court must give due regard to the primary objectives of the provision under scrutiny as viewed in harmony with all related provisions, considered as a whole" [citations omitted] Roberts v. McNary,636 S.W.2d 332, 335 (Mo. banc 1982).
Under these principles, the Supreme Court's explanation of the meaning of "municipality" as used in Article VI, Section 16, Missouri Constitution, in regard to governmental entities allowed to enter into cooperative contracts as set forth in St.Louis Housing Authority v. City of St. Louis, supra, is highly persuasive in interpreting "municipality" as used in Article III, Section 12, Missouri Constitution.
 "Municipality" is all embracing. It includes, of course, cities of all classes, as well as towns, but it includes also a non-profit agency, such as plaintiff [St. Louis Housing Authority], which is authorized to exercise public and essential governmental functions . . . . Municipality now has a broader meaning than "city" or "town", and presently includes bodies public or essentially governmental in character and function and distinguishes public bodies, such as plaintiff, from corporations only quasi-public in nature. [Citations omitted.] But the two terms (municipality and municipal corporation) are often interchangeably used. Likewise, "municipal corporation", in the broader sense now includes public corporations created to perform an essential public service and "is applied to any public local corporation exercising some function of government". "Municipal corporation" now also includes a corporation created principally as an instrumentality of the state but not for the purposes of regulating the internal local and special affairs of a compact community. [Citations omitted.] [St. Louis Housing Authority v. City of St. Louis, 239 S.W.2d 289, 294-295 (Mo. banc 1951).]
Comparing the description of Bi-State given above to the description of "municipality" set forth in St. Louis HousingAuthority v. City of St. Louis, supra, it is evident that Bi-State comes within that description. It is a body politic and corporate exercising functions relating to public needs for transportation and other matters and being financed at least in part by sales tax revenues. It is completely dependent for its existence and characteristics on the General Assembly. The General Assembly has passed laws necessary to its creation and later passed laws necessary to enlarging its powers. Moreover, the legislature passed the Transportation Sales Tax Act of 1973, Sections 94.600, et seq., RSMo, allowing local sales tax money to be used to support Bi-State. Therefore, concluding that Bi-State is a municipality to which Article III, Section 12 is applicable is consistent with the description of "municipality" in St. Louis Housing Authority v. City of St.Louis, supra.
The primary objectives of Article III, Section 12, also require the broad interpretation of municipality as set forth inSt. Louis Housing Authority v. City of St. Louis, supra.
The passage of laws by the representatives of the people lies at the very root of the republican form of government, and the people approved Article III, Section 12, to provide broad protection for that process. Notice that the provision does not allow the legislator merely to refrain from voting on issues involving the municipality but goes so far as to require vacation of his legislative seat if this provision is violated. The apparent objectives of Article III, Section 12 are to prevent someone who is receiving money by reason of his employment with the municipality from being in a position in the General Assembly to have the discharge of his responsibilities as a legislator affected by his position with the municipality and to prevent even the appearance of this impropriety. Therefore, the word "municipality" should be given a broad interpretation in order to effectuate a policy designed to protect the integrity of the operations of the General Assembly.
The conclusion that Bi-State is a municipality is consistent with this office's description of Bi-State in Attorney General Opinion No. 218, State Tax Commission, December 30, 1964, wherein this office opined that Bi-State was not protected by charitable immunity:
 The Agency is a public corporation with power to engage in proprietary functions for the common good. Such functions, although in the public interest and beneficial to the community, are businesses in their fundamental nature, and public bodies (such as municipalities) engaged in such activities have always been liable in tort for negligence to the same extent as private operators of similar enterprises. [citations omitted] The immunity of true charities and charitable institutions from tort liability is based on grounds of public policy. No such public policy exists for the purpose of immunizing municipal corporations (which would include the Bi-State Development Agency) from liability for torts in respect of their proprietary functions. [At pages 5 and 6 of Opinion.]
Concluding that Bi-State is a municipality within ArticleIII, Section 12, Missouri Constitution, would also be consistent with Attorney General Opinion No. 317, Durnell, October 23, 1973, in which this office, adopting the broader meaning of municipality as set forth in St. Louis Housing Authority v.City of St. Louis, supra, concluded that the Land Clearance for Redevelopment Authority of the City of Springfield (created pursuant to Sections 99.300 to 99.660, RSMo) was a municipality for purposes of Article III, Section 12. That Authority is very similar to Bi-State in that it is a "public body corporate and politic", Section 99.330, RSMo; is governed by a board of appointed commissioners, Section 99.340, RSMo; and possesses specific functions and powers relating to public services at a local level, Section 99.420, RSMo.
Since Bi-State is a municipality within Article III, Section 12, the next question is whether an attorney's representation of Bi-State in defense of claims against it and in regard to other legal matters, constitutes "employment under . . . any municipality". This issue is resolved by reliance on Attorney General Opinion Letter No. 355, Salveter, August 19, 1969, in which it was concluded that Article III, Section 12 prohibited a legislator from serving as an attorney for a state college.
 The term "employment" is subject to a variety of legal interpretations depending upon the context in which it arises. Since the purpose of Article III, Section 12 appears to be to prevent the potential conflicts of interest which would arise if a senator or representative were to have other duties with respect to other governmental bodies, we are of the opinion that a broad interpretation of the word "employment" is called for when construing that section.
 We note that the term "employment" is used with reference to the attorney-client relationship in Supreme Court Rule 4.37. That rule reads, "The duty to preserve his client's confidence outlasts the lawyer's employment, . . ." (emphasis supplied). [Page 2 of Opinion.]
In the new Supreme Court Rule 4 (effective January 1, 1986), the term "employment" is still used in the same way. See, Rules 1.5(a)(2); 1.11(c)(1) and (2); 1.12(b); and, 7.3(a) and (b).
Because this matter is resolved by the conclusion that Bi-State is a municipality within Article III, Section 12, we do not opine upon whether the employment as an attorney for Bi-State is also "employment under . . . this state", as discussed in Attorney General Opinion No. 412, Grellner, October 25, 1966; or whether such employment violates Section105.456.1(1), RSMo Supp. 1985.
CONCLUSION
It is the opinion of this office that an attorney who is also a member of the General Assembly of the State of Missouri may not render legal services to the Bi-State Development Agency of the Missouri-Illinois Metropolitan District because such would constitute "employment under . . . any municipality" of the State of Missouri and would be prohibited by Article III, Section 12, Missouri Constitution.
Very truly yours,
 WILLIAM L. WEBSTER Attorney General
Enclosures:
 Opinion No. 218, State Tax Commission, December 30, 1964 Opinion No. 317, Durnell, October 23, 1973 Opinion Letter No. 355, Salveter, August 19, 1969 Opinion No. 412, Grellner, October 25, 1966